431 So.2d 880 (1983)
Mary S. PICKELS, Plaintiff/Appellant,
v.
Clovis BROWN, Defendant/Appellee.
No. 15349-CA.
Court of Appeal of Louisiana, Second Circuit.
May 3, 1983.
*881 McClure & McClure by John C. Pickels, Alexandria, for plaintiff-appellant.
Rogers M. Prestridge, Bossier City, for defendant-appellee.
Cook, Yancy, King & Galloway by John D. Collinsworth, Shreveport, for third-party defendants-appellees Bamburg Mechanical, Inc., and Northern Assur. Co. of America.
Before MARVIN, JASPER E. JONES and SEXTON, JJ.
SEXTON, Judge.
Plaintiff brought suit against both the contractor who she hired to fix the leaking roof on her veranda, and the sub-contractor who the contractor hired to assist him in making the necessary repairs. Plaintiff alleged that, although she had paid the contractor for his work, he and the sub-contractor had failed to fix the leak. The trial court granted plaintiff a $1,000 judgment against the contractor. Plaintiff now appeals, seeking a judgment against the sub-contractor, and an increase in the amount of the award. We affirm.
Plaintiff-appellant in this cause is Mrs. O.K. Pickels, a 74 year old widow who resides in a residential area of Shreveport, Louisiana. The defendant contractor against whom the trial court granted recovery is Clovis Brown, a remodeler who lives in Bossier City. The defendant sub-contractor against whom all civil claims were dismissed is Bamburg Mechanical Incorporated, a construction firm located in Bossier City.
The roof of Mrs. Pickels' veranda began to leak sometime in the summer of 1980. The leak caused significant interior damage, most notably the deterioration of the veranda's plaster ceiling and sheetrock walls.
After at least two repairmen had unsuccessfully attempted to stop the leakage, Mrs. Pickels discussed the problem with Clovis Brown. In a tersely worded contract dated September 12, 1980, and signed by both Brown and Mrs. Pickels, Mr. Brown contracted for a sum of $1,085, to install a metal roof on the veranda, replace the interior sheetrock wall that had been damaged by rain and paint the newly installed work. The contract included a written one year guarantee by Mr. Brown of the quality of his workmanship and materials. It is clear that Mrs. Pickels indicated to Mr. Brown that she was distraught over the leakage and felt helpless to alleviate it, and that Mr. Brown assured Mrs. Pickels that he would competently address the problem and fix the leak.
Mr. Brown's repair work involved the interior of the stoop, where he replaced and repaired the stoop's damaged interior walls and woodwork and painted the newly repaired walls. Although the inner ceiling was not damaged enough to require the replacement of its sheetrock, Mr. Brown did have it painted.
While Mr. Brown did the necessary carpentry on the inside of the stoop, Bamburg Mechanical sub-contracted with Brown to replace the roof over Mrs. Pickels' veranda. Pursuant to its contract with Brown, Bamburg installed a sheet metal roof on Mrs. Pickels' veranda. Bamburg also installed flashings on, and adjacent to the veranda's metal roof in order to seal any gaps around its perimeter, and the joint between the main roof of the house and the veranda roof. Mr. Brown paid Bamburg $400 for these services.
Mrs. Pickels found the repairs to her veranda satisfactory and aesthetically pleasing, and paid Mr. Brown $1,085 pursuant to the agreement. However, subsequent to the repairs, heavy rains fell and Mrs. Pickels discovered that the leak in the veranda *882 roof still existed, despite Mr. Brown's efforts. The roof continued to leak, causing new damage to the interior walls and ceiling of Mrs. Pickels' veranda. The walls and ceiling of the stoop became water stained, and the plaster in the ceiling began to cave in. This condition was still deteriorating at the time of the trial.
Mrs. Pickels filed suit against Mr. Brown on May 5, 1981, asserting that, because of his defective workmanship, he was legally indebted to Mrs. Pickels in the amount of $4,500. This $4,500 total was constituted by the $3,000 allegedly necessary to repair her front stoop, and by an additional $1,500 representing mental anguish, embarrassment, personal suffering and loss of sleep caused by the deteriorated condition of her veranda. Mr. Brown answered, asserting that the leak was located not in the veranda roof, but in the roof over the main part of the house; Mr. Brown also filed a third party demand against the sub-contractor Bamburg, praying that Bamburg be held legally responsible for any amount for which Brown might be cast in judgment. The plaintiff, Mrs. Pickels, thereafter amended her original petition to join as defendants Bamburg, and its insurer, Northern Assurance Company of America.
After a trial on the merits, the trial court found that Mr. Brown had "contracted with the plaintiff to not only repair the existing damage, but to also fix the leak." The court concluded that "There is no question that Mr. Brown did not correct the leak." The trial court accordingly returned a judgment in the amount of $1,000 in favor of Mrs. Pickels and against Mr. Brown. The court further rejected Mrs. Pickels' claims against Bamburg, and Clovis Brown's third party demand against Bamburg. Plaintiff, Mrs. Pickels, has appealed the trial court's decree, contending in her first assignment of error that she should have been granted a judgment against Bamburg, and asserting in her second assignment that the court improperly evaluated her damages and that her recovery should be increased on appeal. Appellant seeks no further relief with respect to Brown, and we understand the judgment against him has been satisfied. Brown has neither appealed nor answered the appeal. Therefore we do not address the correctness of the judgment against Brown.
The essence of plaintiff's claim against Bamburg is that Bamburg caused her harm by failing to install a watertight roof and flashings over her veranda. We note that, while there is no contractual privity between plaintiff and Bamburg in the ordinary sense, there are several legal theoretic bases which could potentially support a judgment against Bamburg, in favor of Mrs. Pickels, the plaintiff.[1]
Mrs. Pickels could argue that the contract between Brown and Bamburg was a stipulation pour autrui which inured to her benefit; [2] that there was an implied contract between Bamburg and herself;[3] or that Bamburg was liable to her in quasi-contracts *883 under the legal theory expressed by the Latin maxim "actio de in rem verso."[4] Mrs. Pickels could argue that Bamburg had committed a quasi-offense or tort through an allegedly negligent installation of the roof.[5] In short Mrs. Pickels could claim, under a number of alternative theories, that Bamburg had a civil obligation[6] to her which arose either from the consent of the parties or by operation of law.[7]
*884 While these theories of recovery constitute interesting matter for contemplation, our factual determination herein entirely pretermits a discussion of their applicability. Our factual determination, simply stated, is that plaintiff did not prove by a preponderance that the damage-causing leak was located in the metal roof or flashings installed by Bamburg over plaintiff's veranda. Thus, assuming arguendo that Bamburg owed Mrs. Pickels a duty to install a watertight veranda roofwhether this duty was rooted in tort, quasi-contract, implied contract, or contract for the benefit of a third partyplaintiff has not proven the breach of this obligation.
It is initially important to note the relative positions of the veranda and the main house. The veranda in question directly abuts the front of Mrs. Pickels' wood frame house and the front door of Mrs. Pickels' house is located at the front of the veranda. The main roof of plaintiff's home sweeps steeply downward to the veranda roof which is located at the base of the main roof. The veranda roof is connected to the main roof by flashings which are designed to serve as a watertight seal and joint between the roofs of the house and veranda, and to prevent any intrusion of water into the house beneath the juncture of the two roofs.
One problem with plaintiff's factual assertion that Bamburg's work was faulty, is that there appear to be several structurally deficient areas in the main roof of the house in which the leak could have existed. Photographic evidence indicates that the roof of the main house is visibly old and has noticeably deteriorated with age. There are several broken shingles on the house near the roof of the veranda. The theory that a leak existed in the main roof rather than in the veranda roof is corroborated by the testimony of plaintiff's own witness, roofing contractor Edward Durham. Mr. Durham testified by deposition that he would not assume the obligation of fixing Mrs. Pickels leak unless he replaced the main roof which covered Mrs. Pickels' entire house.
Furthermore, Clovis Brown along with Howard Aucoin, the Bamburg employee who installed the metal roof and flashing, returned to Mrs. Pickels' house after the initial complaint to check for leaks. Brown and Aucoin sprayed water under high pressure directly upon the roofing installed by Aucoin on behalf of Bamburg. Both men unequivocally testified that the direct application of the water demonstrated no leakage in any of the roofing installed by Aucoin. As the trial court noted in its written reasons for judgment, the testimony indicated that the work done by Bamburg (Aucoin) was rendered "in a professional manner and was not defective in any way."
In other words the plaintiff has failed to demonstrate the location of a leak or defect in Bamburg's installation. As the trial court noted, "the evidence does not show what is causing the continued leak." We conclude, from the above mentioned facts and testimony, that plaintiff did not prove by a preponderance that Bamburg breached any putative legal duty to her by making a faulty installation.
Appellant's assignment with respect to quantum is disposed of by the foregoing determination. Plaintiff's award cannot be increased with respect to defendant Brown, since that defendant has been conventionally released by plaintiff from any further liability. We have held that the other defendant, Bamburg, is not civilly liable to plaintiff.
We conclude, for the above reasons, that plaintiff did not prove by a preponderance that Bamburg installed a leaky veranda roof, and that plaintiff therefore did not establish that Bamburg violated an alleged duty to her. We hold, furthermore, that plaintiff's contentions as to quantum are disposed of by the procedural posture and result of this case. Thus, the trial court's judgment dismissing all claims against Bamburg and granting plaintiff a $1,000 award against Brown is in all respects affirmed at appellant's costs.
AFFIRMED.
NOTES
[1] The general rule, of course, is that there can be no contractual liability in the absence of privity. See Lumber Products, Inc. v. Hiriart, 255 So.2d 783 (La.App. 4th Cir.1971); Cambais v. Douglas, 167 La. 791, 120 So. 369 (La.1929). This legal rule flows in part from LSA-C.C. Art. 1889, which decrees that a party to a contract may not bind another person who is not a party to the contract.
[2] LSA-C.C. Arts. 1890 and 1902 provide that two persons may, by contract, agree to confer a benefit upon a third person. Such a contract for the benefit of a third party cannot be revoked without the consent of the third party if he "has signified his assent to accept it." LSA-C.C. Art. 1902. In his analysis in State ex rel. Guste v. Simoni, Heck & Associates, 331 So.2d 478 (La.1976), then Supreme Court Justice Tate applied the precepts of Articles 1890 and 1902 to allow a building owner to recover from a sub-contractor for defective workmanship. In that case, although there was contractual privity between the building owner and the general contractor, and privity between the general contractor and the sub-contractor, there was no privity between the building owner and the sub-contractor.
[3] LSA-C.C. Art. 1811 acknowledges the existence and efficacy of implied contracts and provides that:

"The proposition as well as the assent to a contract may be expressed or implied:
Express when evinced by words, either written or spoken;
Implied, when it is manifested by actions, even by silence or by inaction, in cases in which they can from circumstances be supposed to mean, or by legal presumptions are directed to be considered as evidence of an assent."
See, e.g., V-8 Taxi Cab Service, Inc. v. Hayes, 322 So.2d 442 (La.App. 4th Cir.1975).
[4] The Civil Code expressly recognizes that unwritten or quasi-contracts may form the basis for civil liability. See LSA-C.C. Arts. 2292-2313. An actio de in rem verso represents one of several quasi-contractual actions available to litigants in Civilian jurisdictions, and the legal requirements for this type of action were thoroughly discussed in Capitano v. Huber, Hunt & Nichols, Inc., 359 So.2d 308 (La.App. 4th Cir. 1978), and more recently in HMC Management Corp. v. New Orleans Basketball Club, 375 So.2d 700 (La.App. 4th Cir.1979).
[5] Such an action would of course be founded upon LSA-C.C. Art. 2315 which mandates that "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it," and upon Article 2316, which states that "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." The Louisiana courts have allowed recovery in tort for negligent workmanship, in the absence of privity, in Marine Insurance Co. v. Strecker, 234 La. 522, 100 So.2d 493 (La.1957) and Kendrick v. Mason, 234 La. 271, 99 So.2d 108 (La.1958).

The decrees rendered in Strecker and Kendrick are arguably inconsistent with the traditional doctrinal distinctions between actions ex contractu and ex delicto. The nature of the duty breached is the chief distinguishing factor between an action in tort and an action in contract. Torts involve the violation of a general duty arising from statute or common sense and owed to all, while suits on contract involve the violation of a special duty, conventionally created, and owed to specific persons. Torts involve a violation of the rule of reason, while contract actions deal with the contravention of the covenant that forms the law between the parties. As Planiol suggests, a contract may be breached by an act or omission less severe and substandard than that required to constitute a tort. Furthermore, Planiol contends, legal presumptions favor a plaintiff in contract actions, and a defendant in tort actions. In addition to these distinctions in the character of the two actions, there are significant differences in their effect: tort actions prescribe in one year and contract actions prescribe in ten, and plaintiffs in tort actions generally receive a fuller measure of indemnification. For further illumination of the differences between tort and contract actions, See LSA-C.C. Arts. 3536, 3544; Kozan v. Comstock, 270 F.2d 839 (5th Cir. 1959); Iberville Land Co. v. Amerada Petroleum Corp., 141 F.2d 384 (5th Cir.1944); Dan George, Inc. v. Paramount Pictures, 145 F.Supp. 523 (W.D.La.1956); Kohn v. Mayor of Carrollton, 10 La.Ann. 719 (La.1855); Planiol, Traité Élémentaire De Droit Civil, Vol. 2, § 874 (Trans.La.State Law Inst.1959).
It should be noted that while the decisions rendered in Strecker and Kendrick may not adhere to all of the classic doctrinal distinctions between actions in tort and contract, these decisions seem to comport with the Civil Code. As Justice Hawthorne enunciated in Strecker in his exposition of Article 2315, "We know of no provision of the Code which relieves one by whose fault another is damaged from the obligation to repair the damage because there is no privity of contract existing between them." 234 La. 522, 100 So.2d 493, 494. As was similarly stated by Justice Simon in Kendrick, Articles 2315 and 2316 do not contemplate civil responsibility conditioned upon contractual privity and "to so hold ... would be violative of the positive and all inclusive language employed in these articles." 234 La. 271, 99 So.2d 108, 113.
[6] A civil obligation, as opposed to imperfect and natural obligations, is one which is legally binding and "which gives the party, with whom it is contracted, the right of enforcing its performance by law." LSA-C.C. Art. 1757(3).
[7] The Civil Code divides all civil obligations, in relation to their source, into two major categories: those which originate "from the consent of the parties," and those which "are created by the operation of law." LSA-C.C. Art. 1760. The first category is of course constituted by conventional obligations, whether express or implied. The second category of civil obligations may be further divided into obligations which arise solely by operation of law,such as those obligations incidental to tutorship, curatorship, neighborhood, and co-ownership and obligations which arise partly from operation of law and partly from "an act done by the party obliged, or in his favor." LSA-C.C. Art. 2292. This sub-category of civil obligations which arise partly by operation of law and partly from human acts, consists of quasi-contracts, offenses and quasi-offenses. LSA-C.C. Art. 2292.